IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY A. WIEST and LAURA E. WIEST, HIS WIFE,<br><div align="right">Plaintiffs</div><br>v.<br><br>THOMAS J. LYNCH, Chief Executive Officer And Director Of Tyco Electronics Corporation;<br><br>TERRENCE CURTIN, Executive Vice President And Chief Financial Officer Of Tyco Electronics Corporation;<br><br>CHARLES C. POST, ESQUIRE, Sr. Labor & Employment Counsel;<br><br>CHARLES DOUGHERTY, President, Wireless Systems, A Tyco Business Unit; and<br><br>TYCO ELECTRONICS CORPORATION,<br><div align="right">Defendants</div> | CIVIL ACTION – LAW<br><br>NO.<br>JUDGE<br><br>JURY TRIAL DEMAND |

## COMPLAINT

Plaintiffs, Jeffrey A. Wiest (hereinafter "Plaintiff" or "Wiest") and Laura E. Wiest, his wife (hereinafter "Plaintiff" or "Wife"), by their attorneys, and for their Complaint against Defendants, Thomas J. Lynch, Terrence Curtin, Charles Dougherty, Charles C. Post, Esq., and Tyco Electronics Corporation, or together ("Defendants") allege as follows:

## NATURE OF THE CLAIMS

1.     This is a civil action for damages and remedies brought under the whistleblower protection provision of the Sarbanes-Oxley Act of 2002, 18 U.S.C. 1514A and for related state claims under ancillary jurisdiction of federal courts.

2.     Specifically, Defendants discriminated against Plaintiff and coercively discharged him in retaliation for protected disclosures relating to fraudulent accounting practice, attempted shareholder fraud, and lack of compliance with United States Generally Accepted Accounting Principles ("GAAP") with respect to Wiest's employment as manager of Accounts Payable for the U.S. Financial Shared Services Center of Defendant, Tyco Electronics Corporation.

## JURISDICTION AND VENUE

3.    The action arises under the Sarbanes-Oxley Act of 2002, 18 U.S.C.

1541A(a)(1).

4.    A Sarbanes-Oxley Complaint was filed and received by the U.S.

Department of Labor/OSHA on "09 NOV 24 PM 3:16 Harrisburg Area Office", a

copy of the face sheet of which is attached as **EXHIBIT A.**

5.    The Secretary of Labor did not make a final determination in this matter

after 180 days of a timely filed Complaint pursuant to 18 U.S.C. §1541A(b)(1)(B),

although sufficient prima facie evidence was found to begin an investigation.

6.    Plaintiffs now seek relief in U.S. District Court.

7.    This Court has jurisdiction pursuant to 28 U.S.C. §1331, since this

matter is founded on the existence of a federal question.

8.    This Court also has pendent jurisdiction over related state law claims

under 28 U.S.C. §1367(a).

9.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)

since some of the transactions and occurrences which give rise to this Complaint

occurred in the Eastern District of Pennsylvania.

## NATURE OF THE ACTION

10.    Plaintiff, an employee of Tyco Electronics Corporation (hereinafter

"Tyco"), brings this action against Defendants to address their violations of the

Sarbanes Oxley Act of 2002 (hereinafter "SOX"), 18 U.S.C. §1514A, and Tyco's

intimidation, harassment, and constructive termination of his employment as the

manager of Accounts Payable for the U.S. Financial Shared Services Center.

11.    Wiest seeks compensatory damages and all other legal relief permitted

under the SOX and State claims to make Wiest whole.

12.    The individual Defendants were, at the relevant times, Tyco

employees with supervisory authority over Wiest and/or had authority to and did

investigate alleged misconduct, intimidated, created a hostile work environment,

constructively discharged Wiest and otherwise retaliated against him for providing

information to them about Tyco's illegal attempts to process invoices for payment

involving exorbitant expenses for extravagant parties which Wiest reasonably

believed, and was confirmed by Tyco's Tax Department, violated federal and state

tax laws, rules and regulations relating to securities fraud and were almost identical

to parties for which Tyco's former CEO was criminally charged and convicted.

## PARTIES

13.    Plaintiffs Jeffrey A. Wiest (hereinafter "Plaintiff" or "Wiest") and Laura

E. Wiest, his wife (hereinafter "Plaintiff" or "Wife") are adult individuals who reside

at 1453 Meadow Lane, Dauphin, Dauphin County, Pennsylvania.

14.    Tyco Electronics Ltd. (hereinafter Tyco Limited) is a Swiss corporation, (formerly a Bermuda corporation until 2009) and is a company covered by Section 806 of SOX having a class of securities registered under Section 12 of the Securities Exchange Act and/or required to file reports under Section 15(d) of that Act and is registered with the SEC as Tyco Electronics Ltd.  Tyco Electronics Ltd. has an address of Rheinstrasse 20, CH-8200 Schaufhaussen, Switerland +41 (0)52 633 66 61.

15.    Defendant, Tyco Electronics Corporation (hereinafter "Tyco"), is an American corporation  and a wholly-owned subsidiary of Tyco Limited.  Tyco's address is 1050 Westlakes Drive, Berwyn, Pennsylvania 19312.

16.    Defendant Tyco's finances appear as part of the consolidated financial statements provided to Tyco Limited's shareholders.

17.    Defendant, Thomas J. Lynch ("Lynch"), is the current Chief Executive Officer and Director and was the Chief Executive Officer and Director of Tyco Limited during the entire time period in which the violations of Section 806 of SOX hereinafter related occurred.

18.    It is believed and therefore averred that he is also the Chief Executive officer of Defendant Tyco.

19.    Defendant Lynch was personally involved in the attempted and possible actual fraud upon Tyco Limited's stockholders and/or violations of tax laws and the

inappropriate investigation, harassment, hostile environment, and constructive termination of Mr. Wiest.

20.    Defendant, Terrence Curtin (hereinafter "Curtin") is the current Executive Vice President and Chief Financial Officer and was the Executive Vice President and Chief Financial Officer of Tyco Limited during the entire time period in which violations of Section 806 of SOX hereinafter related occurred. He was personally involved in the attempted and possible actual fraud upon Tyco Limited stockholders and/or violations of tax laws and the inappropriate investigation, harassment, hostile environment, and constructive termination of Wiest.

21.    It is believed and therefore averred that Defendant Curtin was also the chief financial officer of Defendant Tyco at all times relevant hereto.

22.    Defendant, Charles Dougherty ("Dougherty"), was the President of Wireless Systems, a Defendant Tyco Business Unit, and was involved with activities constituting potential fraud on Tyco Limited stockholders and attempted and possible violations of tax laws.

23.    Mr. Dougherty is also on the board of directors of Tyco Limited.

24.    Defendant, Charles C. Post, Esquire ("Post"), is the attorney in charge of Human Relations, Sr. Labor & Employment Counsel for Defendant Tyco, and was possibly involved with the inappropriate investigation, harassment, hostile environment, and constructive termination of Wiest.

25.    Mr. Post sent a letter to Mr. Wiest's attorney acknowledging Mr. Wiest's constructive termination stating "We certainly question how he can be an effective manager…"  "It is Mr. Wiest's own conduct and not the routine performance of his duties in accordance with the company's adherence to its ethical standards and the law that has put Mr. Wiest in the situation in which he finds himself."

## FACTUAL BACKGROUND IN SUPPORT OF SOX CLAIM

26.    Wiest is currently fifty-four years of age, married, has a three year old child, and had been employed for thirty-one years in the Harrisburg AMP/Tyco Accounting Department.

27.    Wiest was the manager of  thirty-three up to sixty-five accounting employees.

28.    During his thirty-one years of service in the AMP/Tyco Accounting Department, Wiest never received a single negative job review or oral or written reprimand in his personnel records.

29.    Wiest received, during at least the last four years and possibly the last ten years, Tyco's highest rating "above Tyco Electronic's standard" in his behavior summary and "exceeds expectation" in his result summary.  These highest ratings are given only to a small percentage of employees on both measures.  Two of the last

four reviews emphasize "ethics and values" as a notable strength in his performance. Under the heading "integrity".   The 10-23-08 final assessment states "treats integrity as paramount and takes actions accordingly, can be trusted to follow through as needed."  See also, 10-26-07 Performance and Behavior Assessment.  Mr. Wiest's assessments for the past four years from 12-09-05 to 10-23-08 are attached as **Exhibit B,** as are relevant sections of the Employee Handbook "Employee Guide" defining Tyco's rating system.

30.    Wiest received an "impact bonus" in 2008 for efficiency improvements, cost reductions, and his "continuing focus on doing the right thing."  **(Exhibit C)**

31.    Wiest has functioned in a high stress work environment for the past ten years, has been seeing a cardiologist for arrhythmia and has been hospitalized twice for syncope episodes.  He has also been treated twice with medication for stress-related issues.  This period included a high level of audit scrutiny as a result of the well-publicized Tyco International corporate scandals under Dennis Kozlowski's management.  **(Exhibit D)**.  These audits found no evidence of accounting deficiencies processed through his function.  This period also included ongoing downsizing pressure requiring Mr. Wiest to terminate employees, some of which terminations were very emotional.  He was then required to maintain efficiencies with the lower staffing levels.

32.   <u>In mid-2007</u>, Tyco Electronics separated from Tyco International as an independent business and the new management team opened a headquarters in Berwyn, PA.   <u>At this point</u>, the corporate level expenses/payments <u>that had been handled in Princeton, NJ</u> began to be processed by <u>the Harrisburg, PA accounts payable function managed by Wiest</u>.

33.   From mid-2007, Wiest established a pattern of rejecting and questioning expenses that did not meet standards set by accounting, the SEC and/or tax laws/regulations or which caused ethical concerns.   Wiest's actions and activities since late 2007 are given protected status under Section 806 of the SOX Act.

34.   The most flagrant covered activity occurred in mid-2008 when Mr. Wiest refused to process a payment and sent a note to his management questioning the legitimacy of a $350,000 event being held at the Atlantis Resort in the Bahamas. **(Exhibit E)**  Wiest, as was virtually everyone else at Tyco and in the world, was cognizant of a similar party under Dennis Kozlowski's management.  **(Exhibit D)** He did not want to be any part of a repeat occurrence.

35.   Wiest's questions resulted in examination of the event agenda which determined that there was only one 1.5-hour business meeting during the entire five-day event; that employee spouses and Independent Contractors/Dealers were included, and that processing the transaction as submitted to his function for payment would have resulted in a misstatement of accounting records and a fraudulent tax

deduction since it was being submitted as a business expense but clearly did not qualify as such.  **(Exhibit F)**

36.    Wiest's blocking of payment for the Atlantis party was protected under SOX.

37.    The Atlantis expense had not been properly approved as called for in the corporate Delegation of Authority policy which requires the CEO's (Lynch) approval for expenditures of this type over $100,000.

38.    The controller of the relevant business unit was asked to submit the event for CEO approval which was done.  The CEO approved the cost without comment **(Exhibit G)** which was surprising to Mr. Wiest based on the CEO's statements regarding ethical conduct **(Exhibit H)** and the nature of the expenses included in this event. In fact it was approved by the CEO the same day Wiest raised his objections.  It had not yet been verified that this event had a legitimate business purpose.

39.    Wiest was particularly concerned and was amazed that his superiors authorized an island party with disturbing similarities to the past issues raised under Dennis Kozlowski such as the Roman party with the ice sculpture of David and the $6,000 shower curtain.

40.     Due to these concerns, Wiest provided a copy of the detailed invoice to his management (D. Hofsass) for review.  It was his understanding that Mr. Hofsass also reviewed the invoice with Robert Ott, the Global Controller.

41.     Included expenses that raised particular concerns for the Atlantis party were:  $3,000 for "Mermaid Greeters" and "Costumed Pirates/Wenches"; $2,350 for a "Tattoo Artist (includes tattoos)"and "Limbo" & "Fire" Dancers; $2,500 for "Chair Covers and Sashes" and some rooms for over $1,000 per night with the least expensive costing $475 per night.  **(Exhibit I)**

42.     Wiest had always contended that the fraudulent activities which occurred under the Kozlowski management would have been stopped if they had come through his function.

43.     This requested payment seemed particularly inappropriate from a morale aspect coming in the midst of continued downsizing pressure and seemed contradictory in that this one party equated to approximately seven positions for one year in the accounts payable function managed by Wiest.

44.     As a result of insisting on a review by the tax department **(Exhibit J)**, Wiest's decision was confirmed.  The trip did not qualify as a business expense per IRS guidelines and, if held, would have to be treated as an award and as income to the attendees and reported on their W-2s.

424959                                         11

45.    Apparently after additional management discussion involving at least the Vice President of Tax, the President in charge of the business unit involved (Dougherty) and the CFO, it was decided to go ahead with the event, to treat the proportionate share of the party as income, and to "gross-up" the bonuses to the employees involved.  In other words, the company would pay each highly paid employee an additional amount of cash beyond the value of the trip in order to cover his/her tax liability.  This decision cost the company an additional $131,000 in payments to the employees and included in the calculation the tax liability for the attendance of their wives, bringing the total cost of the event to approximately a half million dollars. **(Exhibit K)**   In addition to the schedule calculating the gross up for the attendees, Exhibit K includes a page taken from the prosecutor's documentation in the Kozlowski case confirming the unacceptability of grossing up perquisites to avoid taxes when there is no benefit to the company.

46.    The amount up  to $7,500 per person or $15,000 per couple additional "income" to these high level employees for the Atlantis party was not part of any approved compensation plan. The final communication to payroll regarding this activity took place in late November of 2008, and was added to the employee's W-2s issued in the first quarter of 2009.  **(Exhibit L)**

47.    There were thirty Tyco employees and twenty-three spouses who attended the event.  All of the employees fell in the highly compensated category

(over the social security wage base of $102,000). There were twenty-eight IC's/dealers who attended and it was left to them as to how (or if) they reported the award on their tax returns.

48.     The business unit under Dougherty at the time also dealt with government contracts and as such fell under Federal Acquisition Regulations (FAR). This event was in compliance with those regulations.

49.     Given the high levels of management involvement in the issues surrounding the Atlantis party and the resulting costs to the company, as well as the displeasure of the event organizers that was evident at the time, Wiest was very concerned about retaliation and retained copies of the relevant records so that he could document his actions as correct.

50.     In addition to the Bahamas event, there were two other conference type events involving the same business unit (under Dougherty) that were presented to Wiest's function for payment with inaccurate accounting/tax treatment and insufficient documentation for tax purposes (IRS requirements include a statement of legitimate business purpose, a list of attendees and separate classification of expenses that are not fully deductible like meals and entertainment). Neither of the submissions had proper approval according to the Tyco Delegation of Authority as they both required CEO level approval like the Bahamas event.

51.     The first of these occurred in mid-2008 at the Venetian Resort in Las

Vegas, NV with an associated cost of $218,000 not including the attendees' travel

expenses.  Wiest directed that the invoice be held pending proper approval and

receipt of correct documentation and accounting treatment.  The tax department was

asked to evaluate the business purpose and, after receiving a "revised agenda of event

activities," they concluded it was acceptable as a business expense and it was

processed.  **(Exhibit M** - Catherine Smith worked for Wiest)

52.     The second event was held in late 2008 at the Wintergreen Resort in

Virginia and cost $355,000 not including individual travel.  The initial invoice for

this event was also presented with insufficient documentation and accounting

breakdown and had been approved, not by the CEO as required, but by one of the

planned attendees which is a further control violation.  All documentation was later

received, but final CEO approval or even visibility did not occur, to the best of

Wiest's knowledge, despite his insistence to the CFO and finally his management that

it should be in accordance with established internal control procedures for approvals

of this type.  **(Exhibit N)**  This is another violation of adherence to established

control requirements of the SOX Act and, as such, Wiest's actions were again

protected.

53.     It became clear that there was significant frustration within the

management of Dougherty's business unit as the result of Wiest's insistence on

following the correct and lawful procedures as confirmed by both Catherine Smith,

Supervisor reporting to Wiest, and Kevin Kelleher, Controller of the business unit

involved in these events.

54.   At this point, Wiest had significant concerns that his actions would not

be supported and that he was being viewed as an impediment to management's ability

to proceed as they saw fit.

55.   Wiest also raised questions regarding the proper accounting treatment of

other corporate management activities through the period from late 2007 to as

recently as September of 2009, including a relatively lavish "holiday party" held only

for the headquarters staff for which the tax department said there is an exception in

the code; a $52,000+ Internal Audit team meeting that did not break out the

entertainment and meal portions in accordance with tax law; and expenses submitted

by the Berwyn tax function for an employee "baby shower" which is not generally

accepted as a business expense across the other parts of the company although they

occur regularly on a self-funded basis.  After at least three attempts to obtain

confirmation that this would be considered a legitimate business expense by the IRS,

Wiest received an email from the tax department (where the shower was held)

indicating that Eric Resch, Executive Vice President of Tax, was 'fine with it'.

56.   There was also a case of what appeared to be clear expense fraud on the

part of a key employee that included duplicate entries and additional nights added to

hotel bills, as well as undocumented expenses that were, very surprisingly, excused as poor record keeping errors. Wiest sent an email to his management as well as the responsible Tyco investigator explaining that the undocumented charges would need to be reported as income to the employee, reimbursed to the company, or not claimed for tax purposes. **(Exhibit O)** Plaintiff was never told how it was resolved.

57. In early August, 2009, Wiest's manager, Mr. Hofsass, gave him tickets to attend a baseball game on August 14, 2009, in Baltimore and informed him that M&T Bank personnel would be there. This was unusual in that such tickets had been generally received by Mr. Hofsass on an annual basis, but he had always handled their distribution and attended as well.

58. In early September, 2009, Mr. Wiest noted that his direct reports and his manager were less communicative and began acting differently to him. He asked his staff in a meeting why they were all so quiet and asked his manager if something was wrong. No explanation was given in either case. It is Wiest's belief that in September, 2009, some investigative activities had begun at that point.

59. On September 17, 2009, just prior to leaving on a previously-planned family vacation, Wiest received a call from Susan Wallace of Tyco Human Resources indicating that he was to meet her in a vacant office. When he arrived, there was another Human Resources person present (Kyleen Beistline). Ms. Wallace was the only one who spoke and the entire meeting was hostile and accusatory with

no indication that any part of its purpose was to seek his input or explanation of the issues presented.

60.    There were three areas of Wiest's alleged misconduct discussed at the September 17, 2009, meeting.

61.    Wiest was accused of misconduct with respect to his use of the baseball tickets given to Wiest a month earlier by Mr. Hofsass.  Ms. Wallace phrased it as a gift from a vendor that had not been reported correctly on a gift form which was a violation of corporate policy.  Wiest mentioned that the tickets had been given to him by Mr. Hofsass, but Ms. Wallace said that was irrelevant.  The letter gifting the tickets to Mr. Hofsass was retained by Mr. Wiest and is attached.  **(Exhibit P)**

62.    Since these tickets were gifted to Mr. Hofsass by the bank, Mr. Hofsass was the one who was obliged to report the gift.  The tickets were handed to Wiest by Mr. Hofsass which seemed unusual as Mr. Hofsass had invited several other Tyco employees from other functions under his management and told Wiest that he should take care of giving the tickets to those individuals (even though they did not report to Wiest) and that he could invite some from his own department.

63.    Wiest gave one ticket to a staff member of his who was also able to attend.

64.    In addition, the event included other M&T Bank clients and personnel and, in the related business discussions that took place, Wiest obtained contact

information from the CFO of Thales Communications, Inc. who had an interest in discussing merger and acquisition activity.

65.    Upon his return to Tyco, Wiest had forwarded that information to the Vice President of Mergers and Acquisitions for Tyco, Jeanne Quirk, on August 20, 2009 (**Exhibit Q**), thereby documenting the conduct of business during the event as he felt was intended.

66.    A second issue raised by Ms. Wallace regarded a relationship Wiest had with a fellow female Tyco employee who was based in Menlo Park, CA, and had occurred ten years earlier over a three month period.  The employee did not report to Wiest.  No part of this relationship had workplace impact.  Attached as **Exhibit R** is an email from Sandra Hohenwarter who was the Human Resources representative for the Financial functions including Wiest and his area at that time.  This offer for social contact makes it clear that she had no concerns about Wiest's character and that she felt such after-hours contact between employees with related job duties was acceptable.

67.    Ms. Wallace also said there were allegations that Wiest made sexually oriented comments to some fellow employees.  Examples given included a comment to an employee going on a honeymoon cruise to not stay on the ship the whole time; a comment about his wife's hormone issues during her pregnancy being difficult for him and a comment regarding the uses of improved flexibility from working out.  It

is noteworthy that the hormone comment would have been several years old as Wiest's child was born in 2006.

68.    There were no details presented as to who had made the accusations or when so that he could potentially understand any motivating factors for the complaints (he had terminated many employees who had friends remaining in the workplace and had to discipline others for work performance).

69.    There were no allegations that Wiest had used profanity or made proposals for sexual acts, only that he had made comments that could have been interpreted as suggestive.

70.    At the September 17, 2009, meeting, it became apparent that Tyco had been investigating him for some time and, undoubtedly during the time period that Wiest was frustrating his superiors in getting their party invoices processed through his department.  Wiest called Mr. Hofsass after the meeting via cell phone, as Mr. Hofsass was coincidentally on vacation when the meeting occurred, to get a better understanding of the situation.  He was told by Mr. Hofsass who had been his boss for the previous twelve years that he was unable to speak with Wiest about the situation.  Mr. Hofsass continued to maintain a "hands-off" position and would not discuss it over the next two weeks.

71.    Wiest never once during his entire thirty-one year career had any employees tell him that any remark he had made was unwelcome on any occasion.

He told Ms. Wallace that he was sure he could resolve any issues of offense taken by speaking directly with those involved, as it was clearly not his intent to offend and he could certainly maintain a business relationship with them in the future.  Ms. Wallace said that there was nothing he could do at this time.

72.    The comments referenced by Ms. Wallace would <u>not</u> be found as offensive to the average employee and certainly fall short of "reasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment" as would be required under Tyco Corporate Policy.

73.    The session ended with Ms. Wallace stating that the allegations were serious, the investigation was ongoing, and that she would be in touch with him.

74.    Wiest received no additional information or contact all day on Friday, September 18, 2009, and asked Ms. Wallace and Mr. Hofsass if there were any issues with him still going on his long-planned vacation, to which they replied no and indicated that he should go.

75.    Wiest went on vacation and spent a very stressful five days with his family from September 19, 2009 through September 23, 2009 trying to hide his anxiety from them but unable to sleep or enjoy his vacation.

76.    Wiest returned on Thursday, September 24, 2009, expecting some type of update on the situation, but heard nothing all day and was, at this point, isolated from his staff and his management.

77.     Wiest was similarly isolated and unable to perform effectively all day

on Friday, September 25, 2009, and again on Monday, September 28, 2009, with no

contact on the investigation or any normal business activity.

78.     On Tuesday, September 29, 2009, Wiest asked Mr. Hofsass about the

status of the investigation and whether he would have a chance to respond to the

allegations and receive any more details as to their origin.  He also stated that he felt

the actions being taken by Tyco were in response to his having rejected or questioned

too many management expenditures.  He was told that if he had any input he had

better call Ms. Wallace as it was at a very serious stage.

79.     Wiest called Ms. Wallace again stating that he didn't feel any of the

allegations noted were serious violations and asking whether he would have a chance

to respond.  He also said that the comments were comparable or even less offensive

than what is regularly seen on prime time television programming.  She again stated

in a short, hostile fashion that she would let him know the outcome of her findings at

some point, but that it was serious and still ongoing.

80.     On the morning of September 30, 2009, Wiest asked Mr. Hofsass about

his performance review which was due to be completed that day and was told "not to

bother" which added significantly to the pressure he was feeling.

81.     Later on September 30, 2009, Wiest began experiencing symptoms that

included shortness of breath, dizziness, chest tightness/pain, extreme fatigue and

weakness in his limbs.  At 3:15 PM, he went to Mr. Hofsass' office and told him that he was not feeling well and was leaving for the day.

82.   From September 30, 2009 Wiest's medical and mental condition deteriorated resulting in his inability to function and return to work

83.   Tyco's investigation and treatment of Wiest  was in retaliation for his actions in insisting on adherence to accurate and lawful accounting practices and it is apparent that he was treated much differently after he began questioning management's illegal actions.

84.   Wiest was given a special Impact Bonus in July and then the outstanding performance evaluation in October of 2008 (including "Above Tyco" standards in ethical behavior) and then in just eleven months was investigated and terminated for reports he made to superiors during an investigation regarding accounting practices.

85.   Wiest claims that the allegations against him and their presentation have been handled in an inequitable and untimely fashion and were not expeditiously discharged in accordance with the U.S. Corporate Policy on Discipline **(Exhibit S)** which notes that Tyco "is committed to fairly administering progressive discipline when necessary", that "a progressive disciplinary process is normally administered" and that "One purpose for administering any form of discipline is to alert and help an employee change and/or improve a behavior that does not meet acceptable practices."

It also outlines the progression options open in following those guidelines.  This

progression (which Wiest has used in enforcing policies for his area) includes: a

Verbal Warning (that is retained only in the manager's file), a Written Warning (that

goes to the Human Resources file) and a Final Warning prior to termination.  In

addition, the "Performance Matters" Employee's Guide **(Exhibit T)** calls for

feedback to be provided "as soon as possible after the behavior in question" and that

"timely feedback can be acted upon, often immediately." Moreover the Tyco

Electronics U.S. Employee Handbook includes the following statement on page 28:

> "The goal of the company's discipline process is to help the
> employee achieve an acceptable standard of conduct and
> performance, and thus continued productive employment.
> Generally, there should be a close correlation between the
> level of disciplinary action and the severity of the situation.
> Improper conduct or substandard performance should be
> dealt with through counseling, progress reviews, coaching,
> and documentation, so that discharge can be avoided when
> possible." **(EXHIBIT U)**

86.     In spite of Wiest's 31 years of meritorious service and outstanding

performance reviews, Tyco's policy was not followed.

87.     Wiest contends that the individual defendants and Ms. Wallace failed to

conform to relevant sections of the Tyco Electronics Employee Handbook **(Exhibit

U),** 1. Introduction p.1-3; 2. Policy Statements, p.3-7, particularly Freedom From

Harassment, Employment Standards, Conduct; 5. General Rules and Procedures,

p.17-22, particularly Disciplinary Guidelines, Complaint Resolution, and

Termination of Employment, pp. 28-31.   Also see, Tyco Discipline Policy 04-03

**(Exhibit S)**.

88.    The psychological pressure inflicted on Wiest by Ms. Wallace of the

Tyco Electronics Human Resources Department over a period of several weeks has

resulted in physical and psychological damage to him.   At this point, Wiest is unable

to work and his ability to function in the future at his present level of management is

in doubt.

## COUNT I

## VIOLATION OF 18 U.S.C. §1514A

JEFFREY A. WIEST
v.
THOMAS J. LYNCH, TERRENCE CURTIN,CHARLES C. POST, ESQUIRE,
CHARLES DOUGHERTY, and TYCO ELECTRONICS CORPORATION

89.    Plaintiff Jeffrey Wiest incorporates all prior paragraphs of his

Complaint as if stated herein.

90.    At all times relevant hereto, Mr. Wiest was an employee of Defendant

Tyco.

91.    At all times relevant hereto, Defendant Tyco was acting as the agent

of Tyco Limited, a publicly traded company, the securities of which were

registered under section 12 of the Securities Exchange Act of 1934.

92.     As part of his investigations into expenditures and accounting practices that Mr. Wiest reasonably believed were in violation of rules and regulations of the Securities and Exchange Commission and Federal tax laws, Mr. Wiest provided information to individuals with supervisory authority over him including D. Hofsass, Robert Ott, and Defendant Lynch, an agent and employee of both Defendant Tyco and Tyco Limited.

93.     It is believed and therefore averred that the information Mr. Wiest provided was shared with other individuals with supervisory authority over him, including Defendant Post, Susan Wallace, and Kyleen Beistline.

94.     It is believed and therefore averred that the information Mr. Wiest provided was shared with other individuals within the company including Defendant Dougherty, Eric Resch, who did not have direct supervisory authority over him, but who had positions senior to his within Defendant Tyco.

95.     As a direct result of the information that Mr. Wiest provided to his supervisors as part of his investigation into accounting practices, Mr. Wiest was threatened, harassed, and otherwise discriminated against in his conditions of employment due to Tyco investigating him for innocuous acts performed long ago.

96.     Defendants Lynch, Curtin, Post, and Doughtery threatened, harassed, and otherwise discriminated against Mr. Wiest in his conditions of employment, as

stated above, in retaliation for his mandatory disclosure to his supervisors of an illegal scheme.

97.    Defendant Tyco, acting through Defendants Lynch, Curtin, Post, and Doughtery, as well as through its agents Eric Resch, D. Hofsass, Susan Wallace, and Kyleen Beistline threatened, harassed, and otherwise discriminated against Mr. Wiest in his conditions of employment, as stated above, in retaliation for his mandatory disclosure to his supervisors of an illegal scheme.  Defendants Lynch, Curtin, and Doughtery are also executives of Tyco Limited, the publicly traded company, and were acting as such when they discriminated against Mr. Wiest.

98.    Defendant Tyco is also vicariously liable for the actions of its employees and agents as stated above.

99.    Mr. Wiest was placed under so much stress that he was unable to continue working at Tyco and was forced into a medical leave of absence.

100.    Mr. Wiest was officially fired from Tyco on April 1, 2010, although he had been constructively discharged on September 30, 2009, when he was forced to leave work with shortness of breath, dizziness, chest tightness/pain, extreme fatigue and weakness in his limbs.

101.    The harassment suffered by Mr. Wiest, as stated above, was a direct violation of 18 U.S.C. §1514A.

102.   As a result of Defendants' violation of SOX, Mr. Wiest suffered significant damages including ongoing health problems, loss of his ability to work, and loss of his position at Tyco, and claims are made therefor.

103.   Wiest's medical condition will not allow him to return to his former position and he requests a "make whole" remedy that includes a continuation of income at his 2008 salary (including annual bonus) of $127,320.99 along with an additional 30% for benefits (his 401k and pension supplement alone account for 11.6%  plus contribution to Social Security, health insurance, etc.), with 2% per year increase for productivity calculated to his expected retirement age of 70 (he has a 2 year old child) from his current age of 53 years and 6 months which totals over $3,230,000, and claims are made therefor.

104.   Mr. Wiest, because of his age, health and the institution of this lawsuit, is unlikely to earn more than a minimal amount.

105.   Wiest seeks compensatory damages for injury to his health and reputation, including reimbursement for medical bills, pain and suffering, as well as payment of all associated legal fees as also called for by SOX Section 806 and claims are made therefor.

WHEREFORE, Plaintiff, Jeffrey Wiest, demands judgment against Defendants in an amount in excess of any amount requiring submission of this case to a Federal Magistrate Judge.

424959

## COUNT II

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

JEFFREY A. WIEST

v.

THOMAS J. LYNCH, TERRENCE CURTIN,CHARLES C. POST, ESQUIRE, CHARLES DOUGHERTY, and TYCO ELECTRONICS CORPORATION

106.   Plaintiff Jeff Wiest incorporates all prior paragraphs of his Complaint as if stated herein.

107.   The illegal actions of the Defendants and their agents, as stated above, which accused Mr. Wiest of accepting donations in violation of company policy, accused Mr. Wiest of harassing other employees, accused him of having an inappropriate relationship 10 years earlier, and threatened him with discipline or the loss of his job constituted outrageous conduct.

108.   The Defendants' actions to improperly single out Mr. Wiest were intentional and were done with reckless disregard to the damage that they would cause to Mr. Wiest.  It is believed, and therefore averred, that the Defendants' actions were an attempt to punish Mr. Wiest for making mandatory disclosures to his superiors about the attempted illegal accounting practices at Tyco.

109.   Defendants Lynch, Curtin, Post, and Doughtery harassed Mr. Wiest, as stated above, in retaliation for his mandatory disclosure of an illegal scheme to his supervisors.

110.   Defendant Tyco, acting through Defendants Lynch, Curtin, Post, and Doughtery as well as through its agents Eric Resch, D. Hofsass, Susan Wallace, and Kyleen Beistline harassed Mr. Wiest, as stated above, in retaliation for his mandatory disclosure of an illegal scheme to his supervisors.

111.   Defendant Tyco is also vicariously liable for the actions of its employees and agents as stated above.

112.   As a result of the Defendants' actions, Mr. Wiest suffered severe emotional distress and bodily harm which has prevented him from working since September 30, 2009.

113.   As a result of his injuries, Mr. Wiest has suffered lost wages and a permanent diminution of his future earning capacity and claims are made therefor.

114.   As a result of his injuries, Mr. Wiest has suffered anxiety, mental anguish, humiliation, and loss of life's pleasures and enjoyment and claims are made therefor.

115.   As a result of his injuries, Mr. Wiest has been forced to incur liability for medical bills, medical treatment, medications, and other similar expenses in an attempt to restore himself to health, and claims are made therefor.

116.   As a result of his injuries, Mr. Wiest has suffered physical pain, suffering, and illness, and claims are made therefor.

117.   The Defendants' conduct was so reckless and outrageous that punitive damages are warranted, and claims are made therefor.

WHEREFORE, Plaintiff, Jeffrey Wiest, demands judgment against Defendants in an amount in excess of any amount requiring submission of this case to a Federal Magistrate Judge.

## COUNT III

## WRONGFUL TERMINATION

JEFFREY A. WIEST
v.
THOMAS J. LYNCH, TERRENCE CURTIN,CHARLES C. POST, ESQUIRE, CHARLES DOUGHERTY, and TYCO ELECTRONICS CORPORATION

118.   Plaintiff Jeff Wiest incorporates all prior paragraphs of his Complaint as if stated herein.

119.   Mr. Wiest was required by law to report the illegal accounting treatment of the Kozlowski-like parties to his supervisors to avoid becoming personally implicated in the fraudulent scheme.

120.   Pennsylvania has a strong public policy exception to at-will employment that prohibits an employer from firing an employee for refusing to commit a crime or for making a disclosure that is required by law.

121.   The harassment and firing of Mr. Wiest falls within this Pennsylvania public policy exception to at-will employment because Mr. Wiest was required to report his findings of illegal accounting practices to his superiors.

122.   Defendants Lynch, Curtin, Post, and Doughtery wrongfully terminated Mr. Wiest, as stated above, in retaliation for his mandatory disclosure to his supervisors of an illegal scheme.

123.   Defendant Tyco, acting through Defendants Lynch, Curtin, Post, and Doughtery as well as through its agents Eric Resch, D. Hofsass, Susan Wallace, and Kyleen Beistline wrongfully terminated Mr. Wiest, as stated above, in retaliation for his mandatory disclosure to his supervisors of an illegal scheme.

124.   Defendant Tyco is also vicariously liable for the actions of its employees and agents as stated above.

125.   Defendants' harassment of Mr. Wiest was the direct and proximate cause of his termination from Tyco on April 1, 2010, and of his constructive discharge on September 30, 2009.

126.   As a result of his wrongful termination, Mr. Wiest has suffered past lost earnings and a future loss of earning capacity.

127.   The Defendants' conduct was so reckless and outrageous that punitive damages and attorney fees are warranted, and claims are made therefor.

WHEREFORE, Plaintiff, Jeffrey Wiest, demands judgment against Defendants in an amount in excess of any amount requiring submission of this case to a Federal Magistrate Judge.

## COUNT IV

## LOSS OF CONSORTIUM

LAURA E. WIEST

v.

THOMAS J. LYNCH, TERRENCE CURTIN,CHARLES C. POST, ESQUIRE, CHARLES DOUGHERTY, and TYCO ELECTRONICS CORPORATION

128.   Plaintiff Laura Wiest incorporates all prior paragraphs of his Complaint as if stated herein.

129.   Defendants Lynch, Curtin, Post, and Doughtery harassed and wrongfully terminated Mr. Wiest, as stated above, in retaliation for his mandatory disclosure to his supervisors of an illegal scheme.

130.   Defendant Tyco, acting through Defendants Lynch, Curtin, Post, and Doughtery as well as through its agents Eric Resch, D. Hofsass, Susan Wallace, and Kyleen Beistline harassed and wrongfully terminated Mr. Wiest, as stated above, in retaliation for his mandatory disclosure to his supervisors of an illegal scheme.

131.   Defendant Tyco is also vicariously liable for the actions of its employees and agents as stated above.

132.   As a result of the Defendants' actions, Mr. Wiest suffered significant physical and emotional injuries, as stated more fully above.

133.   As a result of the injuries suffered by her husband, Jeff Wiest, Laura Wiest has suffered a loss of the care, custody, society, consortium, relationship, support, and household services of her husband, and claims are made therefor.

WHEREFORE, Plaintiff, Laura Wiest, demands judgment against Defendants in an amount in excess of any amount requiring submission of this case to a Federal Magistrate Judge.

Respectfully submitted,

ANGINO & ROVNER, P.C.

for
Daniel Christopher
91895

Richard C. Angino, Esquire
I.D. No. 07140
4503 N. Front Street
Harrisburg, PA  17110
(717) 238-6791
Attorney for Plaintiff

Date:  7/6/10

424959                                   33