# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEFFREY A. WIEST et al.,** | : | |
| *Plaintiffs*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **TYCO ELECTRONICS CORPORATION,** | : | **No. 10-3288** |
| *Defendant*, | : | |

PRATTER, J.                                                                                    APRIL 10, 2015

## MEMORANDUM

Jeffrey and Laura Wiest's Amended Complaint (Docket No. 96) alleges retaliation under Section 806 of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A, wrongful discharge, intentional infliction of emotional distress, and loss of consortium. Tyco Electronics Corporation ("Tyco") moves for summary judgment on each of those claims. After Tyco filed its Motion for Summary Judgment (Docket No. 98), Plaintiffs have represented that they are withdrawing their claims for wrongful discharge, intentional infliction of emotional distress, and loss of consortium. As a result, the Court will address only whether Tyco is entitled to summary judgment on Mr. Wiest's Section 806 retaliation claim.

For the reasons that follow, the Court will grant summary judgment in favor of Tyco.

## I.     FACTUAL BACKGROUND[1]

As Tyco's Manager of Accounts Payable, Mr. Wiest was the highest-ranking employee in Tyco's Accounts Payable Department. He worked for Tyco for more than 30 years and generally had an exemplary record. At all times relevant to this lawsuit, Mr. Wiest was responsible for overseeing the review and processing of invoices presented to Tyco for payment. Douglas

---

[1] The facts are undisputed unless expressly noted. Where there is a factual dispute, as long as Plaintiffs have record support for their position, the facts are viewed in the light most favorable to them.

Hofsass, Tyco's Senior Director of Shared Financial Services, was Mr. Wiest's immediate supervisor.

A.    Alleged Protected Activity

Mr. Wiest alleges that he suffered actionable retaliation because he challenged expenses and invoices submitted in connection with three Tyco events: (1) the M/A Com 2008 Annual Recognition Event in the Bahamas (the "Bahamas Event"); (2) the M/A Com Sales Meeting at the Venetian Resort in Las Vegas (the "Venetian Event"); and (3) the Wireless Systems Segment Business Review Meeting at the Wintergreen Resort in Virginia (the "Wintergreen Event"). Each of the three events was for Tyco's Wireless Business Unit, which was led by Charles Dougherty.

In June 2008, the Wireless Business Unit held a sales incentive program in the Bahamas, known as an Area Recognition Event, to reward the sales employees and independent dealers of Tyco products who had achieved or exceeded their sales targets in the preceding year. Tyco employees were permitted to bring significant others to the event. On May 29, 2008, after receiving a request to pay invoices related to the Bahamas Event, Cathy Smith, a supervisor in the Accounts Payable Department and Mr. Wiest's subordinate, contacted an individual in the Wireless Business Unit by email to ask about the event's business purpose, attendees, and accounting code. Later, Mr. Wiest sent an email to Mr. Hofsass to identify the same inquiry that Ms. Smith had already raised. Mr. Wiest's email to Mr. Hofsass was the only email he sent questioning the accounting or tax treatment of the Bahamas Event. Thereafter, Mr. Wiest was included on numerous emails in which Mr. Hofsass shared the concerns that Mr. Wiest and Ms. Smith had expressed with members of Tyco's Tax Department. On June 10, 2008, the Tax Department determined that the Bahamas Event should be treated as taxable income to the attending employees. On July 14, 2008, Tyco's CFO Terrence Curtin told Mr. Hofsass and Mr.

Wiest that Tyco's CEO Thomas Lynch had made the decision to "gross up" the income of the employees and spouses attending the Bahamas, so as to cover their unanticipated tax liability. On December 5, 2008, Tyco sent an email to attendees of the Bahamas Event, explaining Tyco's decision to "gross up" the payment.

Similarly, on June 10, 2008, Ms. Smith sent an email to the Wireless Business Unit, explaining that she could not pay a $218,000 invoice in connection with the Venetian Event until she received a detailed agenda and business purpose for the event, a list of attendees, the correct accounting distribution of the request, and approval of the cost by Mr. Lynch. A few days later, Ms. Smith received all the requested information (except for Mr. Lynch's approval). Ms. Smith contacted the Tax Department at Mr. Wiest's request and asked for a review of the determination that the Venetian Event was a business expense. After Mr. Lynch gave his approval on July 11, 2008, the invoice was paid.

Finally, on October 8, 2008, the Wireless Business Unit contacted Ms. Smith, requesting a $100,000 down payment for the Wintergreen Event, scheduled to take place later that month. Ms. Smith requested and received the agenda and attendee list for the Wintergreen Event. Ms. Smith informed the Wireless Business Unit that she could not process payment without approval from Mr. Lynch. The Wireless Business Unit contacted Mr. Dougherty with Ms. Smith's request. Mr. Dougherty forwarded that email to Mr. Curtin and requested that Mr. Curtin and Mr. Lynch approve the $355,000 overall cost of the Wintergreen Event. Mr. Curtin approved the expense via email, and the Wireless Business Unit forwarded that approval to Ms. Smith, Mr. Hofsass, and Mr. Wiest. This was the first email relating to the Wintergreen Event that included Mr. Wiest. Mr. Wiest sent an email to Mr. Curtin, asking him to confirm that he was approving the entire cost of the event. Mr. Curtin did so. Mr. Wiest later raised the approval issue again to Mr.

Hofsass, noting that Mr. Curtin can only approve up to $100,000 in expenses and Mr. Lynch was not included on Mr. Curtin's email approving the $355,000 cost of the event. Mr. Wiest never raised the issue at any other time or with anyone else.

Plaintiffs claim that Mr. Wiest embarrassed and frustrated members of the Tyco hierarchy, especially the Wireless Business Unit, by voicing the concerns outline above. However, Plaintiffs have presented no evidence to show that Mr. Wiest's conduct caused anyone outside the Wireless Business Unit to feel embarrassed or frustrated. In addition, Mr. Hofsass and Ms. Smith remained employed at Tyco, and neither suffered any adverse actions for advancing the concerns raised by Mr. Wiest. Rather, Ms. Smith actually received a merit increase in her pay every year from 2008 until she was promoted in 2011.

### B.    Investigation of Mr. Wiest

On August 7, 2009, Susan Wallace, Tyco's Director of Human Resources, received a phone call from Mr. Hofsass about employee concerns regarding alleged inappropriate conduct on the part of Mr. Wiest. Mr. Hofsass reported that Mark Williams, Tyco's then-Director of General Accounting Ledger and one of Mr. Wiest's peers, had relayed those concerns after he was approached independently by three female employees—Nichole Quaca, Ashley Minnich, and Beth Gingrich (the "Complainants")—each of whom expressed concerns about Mr. Wiest's conduct in the workplace. On August 11, 2009, Ms. Wallace met with Mr. Hofsass and Mr. Williams, and Mr. Williams presented Ms. Wallace with a written summary of their complaints.

After the August 11 meeting, Ms. Wallace began an investigation into the allegations leveled against Mr. Wiest. Ms. Wallace interviewed 10 employees, including the Complainants and Mr. Wiest himself. Ms. Wallace found during the course of her investigation that: (1) the Complainants relayed similar concerns that Mr. Wiest sought them out for unwanted

conversations when no one else was around, and that they felt trapped in their cubicles during those conversations, (2) interviewees relayed that the female employees in the office (including the Complainants) had developed a "Jeff Alert" system, whereby they would warn one another by email when Mr. Wiest was in the area, (3) several interviewees stated that it was common knowledge in the office that Mr. Wiest had casual sexual relationships with multiple subordinate employees in the past, and that this widespread knowledge added to the pressure and discomfort that the Complainants felt when interacting with Mr. Wiest, and (5) Ms. Quaca was emotional during her interview, and said she feared Mr. Wiest would retaliate against her for coming forward.

Interviewees also told Ms. Wallace that Mr. Wiest made an assortment of inappropriate comments, such as (1) that Ms. Quaca's flexibility must be great for sex and her husband must enjoy it, (2) in response to Ms. Quaca saying, "I have a proposition for you," asking if a coworker should leave the room, (3) after approaching Ms. Quaca at her desk late in the day in 2005 and engaging her in an unwanted conversation that lasted over an hour (and included a lunch invitation), suggesting that his taste for exotic foods translates to a willingness to try new things in the bedroom, and stating that he was unable to assess whether Ms. Quaca's taste for exotic foods would translate into her bedroom performance, (4) commenting about Ms. Schaetzle's body in a way that made her uncomfortable, (5) discussing nude beaches and the use of tea as an aphrodisiac with Ms. Schaetzle, knowing that Ms. Schaetzle was a regular tea drinker; (6) upon learning that Ms. Schaetzle's husband had given her Christmas gifts for her home, asking, "No Victoria's Secret gift card?" (7) telling Ms. Schaetzle that he missed his wife's pregnancy hormones and the positive impact they had on their sex life, knowing Ms. Schaetzle was pregnant, (8) asking to see pictures from Ms. Minnich's bachelorette party, and

then telling her about a "fling" he had with a girl 17 years younger than him who was engaged, which he described as "fun for everyone" and "her last hurrah," (9) telling Ms. Minnich that cruises were a bad idea for honeymoons because the couple may be too far away from the boat if they had "urges," knowing Ms. Minnich was getting married, and (10) after receiving a sign that read "The Big One" in honor of his 50th birthday, telling Ms. Watts he was going to take the sign home and put it on his bedroom door. Although interviewees reported that Mr. Wiest made these comments over several years leading up to the investigation, several of the comments were supported by contemporaneous documentation. (*See* Ex. B to Wallace Decl. at TE1118, 1120; Ex. F to Wallace Decl.; Ex. D to Wallace Decl.).

Ms. Wallace's first interview with Mr. Wiest took place on September 17, 2009, and focused on Mr. Wiest's alleged inappropriate conduct toward female employees. Mr. Wiest never admitted to having had a sexual relationship with any coworkers, denied the extent of his rumored relationships with two particular former subordinates, and denied having ever made the above comments. However, he admitted to having gone on a few dates with a woman named Jocelyn from California years before and stated that any comments he might have made were probably misinterpreted.

The next day, Mr. Wiest called Ms. Wallace and requested an opportunity to "clarify" some of his statements from his previous interview. Later that day, Mr. Wiest explained that if he ever made a comment to a particular female coworker that she should not get married—a comment he could not recall at his previous interview—it would not have been for personal gain, but rather would have been the result of his own experience getting divorced. Mr. Wiest also told Ms. Wallace that any comments made regarding honeymoons, pregnancy hormones, or the like were an attempt at humor and he did not think he had crossed any lines. Mr. Wiest wanted the

opportunity to apologize to those he had offended, but recognized that some of them might not want to interact with him. Mr. Wiest continued to deny having ever bragged about intimate relationships with former employees.

On September 30, 2009, Ms. Wallace met with Charles Post (a member of Tyco's Legal Department), Mr. Hofsass, and Robert Ott (Mr. Hofsass' boss).[2] Ms. Wallace informed them of her findings and reported her preliminary decision to terminate Mr. Wiest's employment, pending a final meeting with him and Mr. Hofsass on October 1, 2009.[3] However, Mr. Wiest went out on short-term disability before October 1, 2009, and the final meeting with Mr. Wiest never took place. On March 31, 2010, upon the expiration of Mr. Wiest's short-term disability benefits and his representation that he was unable to return to work, Tyco terminated Mr. Wiest's employment.[4]

Mr. Wiest testified that in September 2009, Mr. Hofsass refused to speak with Mr. Wiest and acted as if it were a foregone conclusion that his employment would be terminated, but Plaintiffs have presented no evidence to suggest that Mr. Hofsass did so because he was frustrated with Mr. Wiest or because of Mr. Wiest's alleged protected activity. To the contrary, Mr. Wiest testified at his deposition that Mr. Hofsass was "supportive of my raising these

---

[2] There is no evidence to suggest that Mr. Williams or Mr. Hofsass had any material role in the investigation between August 11, 2009 and September 30, 2009. Plaintiffs assert that Alicia Zonetti and Melissa Donnelly were also present at the meeting on September 30, 2009, but that assertion is neither material nor supported by genuine record evidence.

[3] Plaintiffs claim that the final decision to terminate Mr. Wiest's employment was made at the meeting on September 30, 2009, but they point to no genuine record evidence to support that assertion.

[4] On October 2, 2009, Melissa Donnelly (Tyco's Ombudsman) sent an email to senior Tyco executives (including Mr. Ott and Mr. Lynch) containing a report of all open HR investigations. Plaintiffs claim this is evidence that senior Tyco officials were involved in the alleged retaliation, but the email postdated Ms. Wallace's announcement that she had preliminarily decided to terminate Mr. Wiest. Even if the email was somehow relevant despite being sent after Ms. Wallace reached a preliminary decision to terminate Mr. Wiest, it does not establish that Tyco executives were involved in Mr. Wiest's termination because the report listed scores of HR investigations and did not single out Mr. Wiest's investigation.

[compliance] issues." (Wiest Dep. 201:5-8). Furthermore, in June 2008, Mr. Hofsass sent a mass email congratulating Mr. Wiest on his 30 years of service with Tyco and praising his many contributions to the company. And in July 2008, Mr. Hofsass, along with Mr. Ott and Ms. Wallace, approved Mr. Wiest's receipt of a 10% "Impact Bonus" for his achievements at Tyco and for his "continuing focus on 'doing the right thing.'" (*See* Ex. CC to Warden Decl.).

There is no evidence to establish that Ms. Wallace, Ms. Quaca, Ms. Minnich, Ms. Schaetzle, Mr. Williams, or Mr. Post had any knowledge of Mr. Wiest's alleged protected activity at any relevant time. Although Mr. Hofsass was aware of Mr. Wiest's alleged protected activity, Mr. Wiest admits that Mr. Hofsass was not frustrated by it. Instead, Mr. Wiest believes that Mr. Dougherty and the Wireless Business Unit were the main people frustrated with his alleged protected activity. Tyco sold the Wireless Business Unit in May 2009—three months before Ms. Wallace began her investigation.

C.     Procedural History

Plaintiffs filed this lawsuit in July 2010 against Tyco, Mr. Lynch, Mr. Curtin, Mr. Post, and Mr. Dougherty. The Court granted Defendants' Motion to Dismiss in a Memorandum and Order dated July 21, 2011. *See Wiest v. Lynch*, No. 10-3288, 2011 WL 2923860 (E.D. Pa. July 21, 2011). The Third Circuit Court of Appeals reversed. *See Wiest v. Lynch*, 710 F.3d 121 (3d Cir. 2013). On remand, the Court granted in part and denied in part Defendants' Second Motion to Dismiss in a Memorandum Opinion and Order dated April 16, 2014, *see Wiest v. Lynch*, 15 F. Supp. 3d 543 (E.D. Pa. 2014), resulting in the dismissal of all claims against Mr. Lynch, Mr. Curtin, and Mr. Post. Plaintiffs withdrew their claims against Mr. Dougherty and filed their Amended Complaint on November 17, 2014. Tyco then filed its Motion for Summary Judgment.

## II.    LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P.

56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III.  DISCUSSION

#### A.  PROCEDURAL ARGUMENTS

Plaintiffs begin by arguing that the Court should deny Tyco's Motion for Summary Judgment on procedural grounds. First, Plaintiffs argue that (1) the Motion "does not follow Rule 56(a) because it does not identify "each claim or defense–or the part of each claim or defense— on which summary judgment is sought," and because it relies on arguments presented in a Memorandum of Law, which is "not [a] pleading[]" and does not comport with Rule 56." (Pls.' Resp. ¶ 2). But Local Rule 7.1(c) requires that every motion not certified as uncontested "shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion." Indeed, it is well established that a party may state its arguments in favor of summary judgment in a memorandum of law accompanying its motion. Plaintiffs cite no cases in support of their argument, and the Court is aware of no case in which the use of a memorandum of law at the summary judgment stage was cause to deny summary judgment. Consequently, the Court will not deny Tyco's Motion for failure to comport with Rule 56.

Second, Plaintiffs argue that Tyco's Motion is barred under the "law of the case" doctrine. When the Court ruled on Tyco's Motion to Dismiss (Docket No. 35), it held that Plaintiffs' Complaint alleged sufficient facts to state a claim for relief. (*See* Docket No. 51). As this Court explained extensively in that very opinion, the "law of the case" doctrine does not bar consideration of legal questions that have not yet been decided. *See Quern v. Jordan*, 440 U.S.

332, 348 n.18 (1979); *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998). In this case, when the Court ruled on Tyco's Motion to Dismiss, the analysis centered on whether Plaintiffs' allegations, *if true*, stated a claim for relief. Now, the issue is whether Plaintiffs have come forward with sufficient evidence from which a reasonable jury could find that the allegations are, indeed, true. The "law of the case" doctrine is not applicable here.

Finally, Plaintiffs argue that they are entitled to sanctions under Rule 56(h) because the "law of the case" doctrine applies and Tyco's motion is therefore frivolous. Rule 56(h) permits the Court to order sanctions if an affidavit or declaration under Rule 56 "is submitted in bad faith or solely for delay." The Court finds that the motion for summary judgment was not submitted for either of those reasons or with either of those flaws. Plaintiffs argue that Tyco's motion is frivolous because the motion raises "virtually the same issues that have been submitted to the Court on two prior occasions." (Pls.' Resp. ¶ 35). That is simply not accurate, as explained above, and the Court will deny Plaintiffs' request for sanctions.

B.    Retaliation under Section 806 of SOX

For Mr. Wiest's Section 806 retaliation claim to survive summary judgment, he must present evidence from which a reasonable jury could find that (1) he engaged in a protected activity; (2) Tyco knew or suspected that he engaged in a protected activity; (3) he suffered an adverse action; and (4) the circumstances were sufficient to raise the inference that his protected activity was a contributing factor in the adverse action. *See Wiest*, 710 F.3d at 129. If Mr. Wiest establishes those four elements, Tyco can nonetheless avoid liability if it can "demonstrate[] by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of [Mr. Wiest's] protected behavior or conduct." *Blagrave v. Nutrition Mgmt. Servs.*

*Co.*, No. 05-6790, 2008 WL 2682690, at *2 (E.D. Pa. July 8, 2008) (quoting 29 C.F.R.

§ 1980.104(e)(4)).

Tyco's Motion for Summary Judgment focuses on the issue of causation. Tyco argues

that it is entitled to summary judgment on the Section 806 claim for two reasons: first, that

Plaintiffs have produced no evidence to raise the inference that Mr. Wiest's alleged protected

activity was a "contributing factor" in the alleged adverse action; and second, that the undisputed

facts establish that Tyco would have taken the same action regardless of Mr. Wiest's alleged

protected activity.

### 1.     Defining the Alleged Adverse Action

In order to evaluate Tyco's arguments with respect to the issue of causation, it is first

essential to identify the adverse actions that Mr. Wiest allegedly suffered. "[T]he term 'adverse

actions' refers to unfavorable employment actions that are more than trivial, either as a single

event or in combination with other deliberate employer actions alleged." *Menendez v.*

*Halliburton, Inc.*, ARB Nos. 09-002, 09-003, 2011 WL 4915750, at *10 (Dep't of Labor Sept.

13, 2011). Tyco asserts that the "sole retaliatory acts alleged are that [Mr. Wiest] was

*investigated* . . . and a preliminary *decision* was made to terminate his employment, pending a

final meeting with him . . . ." (Def.'s Mem. 23 n.7 (emphasis in original)). Tyco also claims, "It

is undisputed that [Mr. Wiest] was not terminated, demoted, denied a promotion, etc." *Id.*

However, in the Amended Complaint (Docket No. 96), Plaintiffs allege that Tyco's employees

investigated, threatened, interrogated, intimidated, harassed, terminated, and constructively

discharged Mr. Wiest in retaliation for his protected activity. (*See, e.g.*, Am. Compl. ¶ 88). And

at oral argument, Plaintiffs argued that Mr. Wiest suffered three adverse actions: (1) Tyco's

preliminary decision on September 30, 2009 to terminate Mr. Wiest, (2) Tyco's poor treatment of Mr. Wiest in September 2009, and (3) Tyco's ultimate termination of Mr. Wiest.

At oral argument, Plaintiffs conceded that Tyco's investigation of Mr. Wiest was *not* an adverse action. Also, the only evidence Plaintiffs have that Tyco officials treated Mr. Wiest poorly during the September 2009 investigation is Mr. Wiest's testimony that Mr. Hofsass led Mr. Wiest to believe his termination was a foregone conclusion and that Mr. Hofsass said Ms. Wallace's investigation was serious. The Court finds that such conduct, without more, is a trivial unfavorable employment-related circumstance and therefore insufficient as a matter of law to support a retaliation claim under Section 806.[5] As a result, for purposes of analyzing Tyco's Motion for Summary Judgment, the Court will assume that Mr. Wiest suffered only two alleged adverse actions: (1) Tyco's preliminary decision on September 30, 2009 to terminate Mr. Wiest, and (2) Tyco's final termination of Mr. Wiest.[6]

### 2. Evidence of Causation

As the Court explained at the motion-to-dismiss stage of this litigation, "[a] contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Wiest*, 15 F. Supp. 3d at 562. The "contributing factor" standard is

---

[5] This is true despite the Court's reasoning at the motion-to-dismiss stage, *see Wiest*, 15 F. Supp. 3d at 560, because the evidence shows that Ms. Wallace's investigation found serious misconduct and Mr. Wiest was given the opportunity to respond to the charges. Nevertheless, even if Mr. Hofsass's comments were sufficient to constitute an adverse action under Section 806, there is no evidence that the comments were at all related to Mr. Wiest's protected activity. *See infra* Part III.B.2. Consequently, any claim premised on that alleged adverse action would not survive summary judgment.

[6] It is undisputed that Mr. Wiest's termination was made official on March 31, 2010. However, the parties disagree as to whether Mr. Wiest's termination was a foregone conclusion as of September 30, 2009. Tyco presents evidence that Ms. Wallace announced her preliminary decision to terminate Mr. Wiest on September 30, 2009, pending one last meeting with Mr. Wiest. Plaintiffs argue, without any specific citation, that "the record unequivocally shows that a decision was made on September 30, 2009 to terminate Mr. Wiest." (Pls.' Resp. to Statement of Undisputed Material Facts ¶ 65). This dispute is immaterial for the reasons given below. *See infra* Part III.B.2.ii.

"broad and forgiving," and is "significantly more lenient than other causal standards." *Id.* (citing *Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1136 (10th Cir. 2013)). Nevertheless, the Court may grant summary judgment if there is no evidence from which a reasonable jury could draw an inference that retaliation was a contributing factor in some alleged adverse action.

i.      The Preliminary Decision to Terminate Mr. Wiest

In arguing that Plaintiffs have no evidence from which a reasonable jury could find the necessary causal connection between Mr. Wiest's protected activity and Ms. Wallace's preliminary decision on September 30, 2009 to terminate Mr. Wiest, Defendants focus on four possible causal relationships that the Court identified in its opinion on Tyco's Motion to Dismiss: (1) someone responsible for retaliating against Mr. Wiest may have been aware of Mr. Wiest's alleged protected activity; (2) Ms. Wallace's investigation of Plaintiff's inappropriate conduct may have been "trumped up" or "pretextual"; (3) Mr. Dougherty and others in the Wireless Business Unit may have been frustrated with Mr. Wiest due to Mr. Wiest's alleged protected activity; and (4) the temporal proximity between the alleged protected activity and the alleged adverse action may give rise to the inference that Mr. Wiest's protected activity was a contributing factor to the adverse action allegedly taken against him. Plaintiffs have not advanced any other theories of causation, so the Court will address each of these in turn.

First, Tyco argues that Plaintiffs have no evidence to suggest that anyone but Ms. Wallace was involved in the investigation of Mr. Wiest, or to suggest that Ms. Wallace knew of Mr. Wiest's alleged protected activity. Ms. Wallace submitted an affidavit stating that she had no knowledge of Mr. Wiest's alleged protected activity until he filed this lawsuit, and the undisputed evidence in the record demonstrates that Ms. Wallace conducted the investigation by

herself. Plaintiffs respond that Ms. Wallace was personally involved in the fallout from Mr. Wiest's protected activity relating to the Bahamas Event. In support of that assertion, Plaintiffs advance a tortured reading of Mr. Robinson's deposition. Mr. Robinson testified that he spoke with members of Tyco's HR department who dealt with compensation and benefits. (Robinson Dep. 64:13-14). Mr. Robinson also testified that he had dealings with Ms. Wallace involving payroll. (*Id.* at 67:9). Plaintiffs argue that those two statements are evidence demonstrating that Mr. Robinson spoke with Ms. Wallace about the decision to "gross up" compensation for employees who attended the Bahamas Event, and that Ms. Wallace knew Mr. Wiest was responsible for that decision. Plaintiffs' reading of Mr. Robinson's deposition not only takes his statements out of context and misinterprets them, but also ignores Mr. Robinson's repeated assertion that he did not speak with Ms. Wallace about Mr. Wiest or his protected activity. (*See, e.g.*, Robinson Dep. 63:17 ("No, it wouldn't have been Susan Wallace."); 66:20 ("I don't recall.")). Mr. Robinson's testimony falls well short of being evidence that Ms. Wallace knew of or cared about Mr. Wiest's alleged protected activity.

Similarly, there is no evidence in the record to suggest that Mr. Williams (who initially reported the complaints about Mr. Wiest to Mr. Hofsass) had any knowledge of Mr. Wiest's alleged protected activity. Nor is there evidence that Mr. Hofsass played any material role in the alleged adverse actions because of Mr. Wiest's alleged protected activity. Although Mr. Hofsass knew of Mr. Wiest's alleged protected activity and helped initiate the investigation, Mr. Wiest even testified at his deposition that he did not believe Mr. Hofsass contributed to his leaving the company and that "Mr. Hofsass seemed . . . to be supportive of [his] raising [compliance] issues." (Wiest Dep. 201:5-8). Moreover, there is no evidence in the record to suggest that at the meeting on September 30, 2009, Ms. Wallace did anything more than report her conclusion that

Mr. Wiest should be terminated, pending a final meeting. There is no evidence that Mr. Post or Mr. Ott knew of Mr. Wiest's alleged protected activity on September 30, 2009, and there is no evidence that Mr. Hofsass or Mr. Post recommended that Mr. Wiest be terminated.[7] Plaintiffs suggest that Mr. Hofsass was involved in the investigation after he initiated it, but they cite no evidence in the record in support of those assertions and (as explained above) Mr. Wiest stated that Mr. Hofsass supported his protected activity.[8]

Second, the evidence assembled during discovery demonstrates that Mr. Wiest's alleged inappropriate conduct was more serious than Mr. Wiest had first described in his Complaint. Ms. Wallace's records indicate that several female Tyco employees felt very uncomfortable around Mr. Wiest, and that Mr. Wiest made specific, sexually-oriented comments to them. There is no evidence suggesting that the investigation that uncovered those problems was trumped-up or pretextual, apart from Plaintiffs' argument that some of the events uncovered during the investigation occurred years earlier. This argument is not enough to survive summary judgment because more recent events—specifically the Complainants coming forward—were the immediate cause of the investigation. Plaintiffs have no evidence that Tyco selectively

---

[7] Plaintiffs suggest that Mr. Hofsass and Mr. Post recommended that Mr. Wiest be terminated, but they cite to deposition testimony that says no such thing. Mr. Hofsass' testimony states that Ms. Wallace reported at the September 30, 2009 meeting that "the findings were such that HR was going to recommend termination at that point." (Hofsass Dep. 133:12-134:8). Ms. Wallace similarly testified that at the September 30 meeting, she reported her own decision and did not solicit input from the others. (*See* Wallace Dep. 128:24-130:22).

[8] Even if Plaintiffs argue that Mr. Hofsass' knowledge of Mr. Wiest's protected activity made that protected activity a contributing factor in Ms. Wallace's decision, Mr. Wiest's claim would not survive summary judgment because Mr. Hofsass played no material role in her preliminary decision to terminate Mr. Wiest. The record demonstrates that on September 30, 2009, Mr. Hofsass merely learned of and accepted Ms. Wallace's decision.

investigated Mr. Wiest or conducted its investigation in an unusual manner. Plaintiffs conceded at oral argument that the investigation was not itself actionable under Section 806.[9]

Third, Mr. Wiest testified that it was primarily Charles Dougherty and other members of Tyco's Wireless Business Unit who were frustrated and annoyed by Mr. Wiest's alleged protected activity. However, it is undisputed that Tyco sold the Wireless Business Unit in May 2009—three months *before* the alleged adverse action. There is no evidence to suggest that Mr. Dougherty or anyone in the Wireless Business Unit was at all involved in the initiation of Ms. Wallace's investigation, the investigation itself, or the preliminary decision to terminate Mr. Wiest. Thus, even if there was a great deal of frustration with Mr. Wiest in the Wireless Business Unit—and it is indeed questionable whether there is credible evidence in the record to support even that assertion—there is no evidence that any of that alleged frustration was a contributing factor in the preliminary decision to terminate Mr. Wiest.

Finally, the temporal proximity of Mr. Wiest's alleged protected activity and the alleged adverse action cannot give rise to an inference of retaliation for three reasons. First, Mr. Wiest's Amended Complaint alleges that his protected activity ended in 2008, but the Court's reasoning at the motion-to-dismiss stage stressed that Mr. Wiest's original Complaint alleged that his protected activity extended into September 2009. Because the protected activity does not overlap with Ms. Wallace's investigation, the inference to be drawn from temporal proximity is much weaker. Indeed, many courts have found that an 8-month gap between protected activity and an adverse action is not sufficient to survive summary judgment under Section 806. *See, e.g.*, *Riddle*

---

[9] Plaintiffs argue that Tyco violated its corporate policies by terminating Mr. Wiest without first resorting to lesser disciplinary measures. However, Tyco's policies reserved the right to terminate its employees for good cause immediately. (*See* Ex. Y to Angino Decl. at TE160-61). Consequently, absent some evidence to suggest that Tyco treated Mr. Wiest differently than it would have another employee, there is no evidence that Tyco violated its corporate policies.

*v. First Tenn. Bank, Nat. Ass'n*, 497 F. App'x 588, 596 (6th Cir. 2012) (finding a 4-month gap, without more, insufficient to infer causation); *Miller v. Stifel, Nicolaus & Co., Inc.*, 812 F. Supp. 2d 975, 988-89 (D. Minn. 2011) (finding an 8-month gap, without more, insufficient to infer causation). Plaintiffs suggest that the consequences of Mr. Wiest's alleged protected activity continued long after Mr. Wiest voiced his concerns because, from 2008 to 2009, Tyco employees sent hundreds of emails[10] about the tax treatment of the Bahamas Event, the Venetian Event, and the Wintergreen Event. However, Plaintiffs identify *no* evidence showing that *any* Tyco employees considered Mr. Wiest responsible for the tax treatment of those events.

Second, the inference of causation may be severed by a legitimate intervening event justifying the adverse action. *See Fraser v. Fiduciary Trust Co. Int'l*, No. 14-6958, 2009 WL 2601389, at * 6 (S.D.N.Y. Aug. 25, 2009) (quoting *Tice v. Bristol-Myers Squibb Co.*, 2006-SOX-20, 2006 WL 3246825, at *20 (U.S.D.O.L. Apr. 26, 2006)); *Sussberg v. K-Mart Holding Corp.*, 463 F. Supp. 2d 704, 715 (E.D. Mich. 2006). The evidence in the record makes clear that

---

[10] Plaintiffs initially failed to provide the Court with the emails on which they purport to rely. Instead, Plaintiffs provide the Court with an edited summary of those emails. After oral argument, Plaintiffs supplemented their filings with copies of those emails. However, Plaintiffs fail to identify the most relevant emails or any emails that specifically demonstrate a causal connection between Mr. Wiest's protected activity and Ms. Wallace's preliminary decision to terminate Mr. Wiest. The Court will not and is not required to sift blindly through hundreds of pages of emails to find the evidence that Plaintiffs may or may not have to support their claim. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."); *McCann v. Kennedy Univ. Hosp.*, No. 14-4049, 2014 WL 7233381, at *5 (3d Cir. Dec. 19, 2014) ("District Courts are not required to search through the record for evidence to support a party's assertion of the existence of a genuine issue of material fact."); *Cray Comm'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 395-96 (4th Cir. 1994) (explaining that at summary judgment, it is well within the district court's discretion to refuse to "ferret out the facts that counsel had not bothered to excavate").

After oral argument, Plaintiffs also filed on the docket information relating to a $6 million jury award in a completely different case under Section 806, (*see* Docket No. 124), and full copies of numerous opinions in cases involving Section 806, (*see* Docket No. 125). Plaintiffs provided no explanation as to why they filed these materials or how they are relevant to this case. All of these opinions were available to Plaintiffs before they submitted their briefing and none of the filings will alter the Court's analysis.

Ms. Wallace's investigation began after several female Tyco employees, without knowledge of Mr. Wiest's alleged protected activity, reported complaints about Mr. Wiest's behavior. The circumstances of Ms. Wallace's investigation therefore undermine any inference resulting from the temporal proximity between Mr. Wiest's protected activity and the preliminary decision to terminate him.

Finally, the undisputed facts show that Mr. Wiest was treated favorably during and after his protected activity. Two weeks after Mr. Wiest voiced concerns about the Bahamas Event, both Mr. Hofsass and Ms. Wallace congratulated Mr. Wiest on the 30th anniversary of his employment with Tyco and thanked him for his contributions to the company. Two months after Mr. Wiest voiced concerns about the Bahamas Event and the Venetian Event, Mr. Wiest received a maximum 10% Impact Bonus that Ms. Wallace, Mr. Hofsass, and Mr. Ott all approved. Indeed, the Impact Bonus was in recognition of Mr. Wiest's "continuing focus on doing the right thing." Finally, two weeks after Mr. Wiest voiced concerns about the Wintergreen Event—his last alleged protected activity—Mr. Wiest received the best overall rating possible on his annual performance review.[11] Just as evidence of misconduct can be an intervening cause to undermine any inference arising from the temporal proximity between alleged protected activity and alleged adverse action, so too, under the circumstances of this case, can evidence of favorable treatment serve to rebut any inference that might arise from such temporal proximity.

---

[11] Plaintiffs argue that the praise and the bonus were related to Mr. Wiest's performance *before* he engaged in protected activity, but that argument does not reduce the probative value of the evidence. The evidence shows that before Ms. Wallace's investigation, Tyco officials were neither eager to make the workplace uncomfortable for Mr. Wiest, nor interested in undermining his authority. Tyco officials were under no obligation to congratulate him on the anniversary of his employment, and the fact that they gave him positive reviews and awarded him a bonus is convincing evidence to rebut any inference arising from temporal proximity.

ii.    Mr. Wiest's Formal Termination

Plaintiffs argue that Tyco made the final decision to terminate Mr. Wiest on September 30, 2009. Putting aside the fact that Mr. Wiest has no evidence to support that assertion, the Court finds, for the reasons given above, that there is no evidence connecting any decision made on September 30, 2009 with Mr. Wiest's protected activity. *See supra* Part III.B.2.i. Even if Mr. Wiest was finally terminated on March 31, 2010, as the record suggests, there is no evidence that his formal termination was at all related to his alleged protected activity. Therefore, to the extent Plaintiffs claim that Mr. Wiest suffered retaliation that is actionable under Section 806 because he was actually terminated, they have failed to produce sufficient evidence from which a reasonable jury could rule in their favor, and Tyco is entitled to summary judgment.

3.    Same Decision Defense

Alternatively, Tyco argues that it is entitled to summary judgment under the same decision defense. A plaintiff may not recover under Section 806 if the employer "demonstrates by clear and convincing evidence that the employer would have taken the same adverse action in the absence of the complainant's protected activity." 29 C.F.R. § 1980.104(e)(4); *see also, e.g.*, *Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 451 (2d Cir. 2013); *Allen v. Admin. Review Bd., U.S. Dep't of Labor*, 514 F.3d 468, 475-76 (5th Cir. 2008). Plaintiffs concede that Tyco would have investigated Mr. Wiest even if he had not engaged in protected activity, but argues that Tyco would not have terminated Mr. Wiest if he had not engaged in protected activity.

Tyco responds that the Fifth Circuit Court of Appeals' decision in *Hemphill v. Celanese Corp.*, 430 F. App'x 341 (5th Cir. 2011), is directly on point. In *Hemphill*, the court of appeals affirmed the district court's grant of summary judgment because it found the employer proved,

by clear and convincing evidence, that it would have taken the same adverse action had the plaintiff not engaged in protected activity. More specifically, the employer proved that its human resources department conducted a thorough investigation of a non-retaliatory reason for the adverse action, that the primary human resources employee performing the investigation had no prior knowledge of the plaintiff's protected activities, that the witnesses in the investigation had no interest in the employee's protected activities, and that the employee lied about his behavior. *Id.* at 345. The court also observed that there was no evidence to suggest that the two executives who contributed to the decision "had any particular knowledge of or interest in" the employee's protected activity. *Id.* Rather, the only official with any knowledge of the protected activity "simply accepted the unanimous termination recommendation provided." *Id.*

Just as in *Hemphill*, the clear and convincing evidence in the record here establishes that Tyco would have made the same decision had Mr. Wiest not engaged in protected activity. Tyco's HR department conducted a thorough investigation, the investigator had no knowledge of Mr. Wiest's alleged protected activity, the witnesses corroborating complaints about Mr. Wiest had no knowledge of or interest in his protected activity, and Mr. Wiest gave inconsistent and misleading answers during the investigation. Mr. Hofsass was the only one remotely involved in the investigation who had any knowledge of Mr. Wiest's alleged protected activity, but he (1) had previously *supported* Mr. Wiest's efforts to report perceived misconduct at Tyco, and (2) did nothing more than accept Ms. Wallace's recommendation that Mr. Wiest be terminated.

Plaintiffs insist that Mr. Wiest's comments were not enough to justify his termination, but there is no evidence to suggest that the preliminary or final decision to terminate him was at all related to his protected activity. Tyco reserved the right to terminate its employees for good cause without resorting to prior disciplinary measures. Accordingly, absent evidence that Tyco

treated Mr. Wiest differently than any other employee, there is no evidence that Tyco violated its corporate policies in reaching either the preliminary or final decision to terminate Mr. Wiest. Plaintiffs invite the Court to permit a jury to "sit as a super-personnel department that examines an entity's business decisions." *Abels v. DISH Network Serv., LLC*, 507 F. App'x 179, 185 (3d Cir. 2012). The Court will decline that invitation. *See id.* (finding it inappropriate for a court to second guess legitimate employment decisions); *Feldman v. Law Enforcement Ass'ns Corp.*, 752 F.3d 339, 350 (4th Cir. 2014) (extending that reasoning to claims under Section 806); *Riddle v. First Tennessee Bank, Nat. Ass'n*, 497 F. App'x 588, 596 (6th Cir. 2012) (same); *Johnson v. Stein Mart, Inc.*, 440 F. App'x 795, 802 (11th Cir. 2011) (same).

## IV.    CONCLUSION

Plaintiffs have insufficient evidence as a matter of law to prove that Mr. Wiest's protected activity was a contributing factor in Tyco's preliminary or final decision to terminate Mr. Wiest. Consequently, Tyco is entitled to summary judgment on the remaining claims in the Amended Complaint.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE